# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| v. ) | Criminal No.: 2:10-1096-PMD |
| ) | |
| Jarod A. Brown, ) | |
| ) | **ORDER** |
| Defendant. ) | |
| _____ ) | |

This matter is before the court upon Defendant Jarod Brown's ("Defendant" or "Brown") Motion to Suppress all statements, both pre-*Miranda* and post-*Miranda*, made by Defendant during the course of his arrest and subsequent interview by detectives. Defendant is charged with possession of a firearm by a convicted felon. A hearing was held on this motion on April 13, 2011.

## BACKGROUND

On August 20, 2010, around 12:31 a.m., North Charleston Police officers attempted to initiate a traffic stop on I-26 west bound on a Suzuki Forenza after officers observed the vehicle making an illegal lane change and almost striking another vehicle. The vehicle refused to stop, exiting off of I-26 and onto Rivers Avenue at speeds of up to 80 mph. Eventually the vehicle pulled behind the Money Man Shopping Center on McMillan Avenue, and the driver jumped out of the vehicle while it was still moving. Officers then observed the driver, wearing dark shorts and a striped shirt, run through a hole in the fence. On the other side of that fence are the St. Charles Place Apartments. Officers ran the tag on the vehicle and found that its registered owner, Doreen Rouse, lived in the St. Charles Place Apartments in Apartment 508.

Officers Bailey and Van Tine then went to Apartment 508 to speak with Doreen Rouse. At the apartment, Officers were met at the front door by Doreen Rouse, Latoya Rouse (Doreen's

1

daughter), and Tranel Rouse (Doreen's son). Officers explained the reason for their visit and asked Latoya and Doreen if they had seen anyone else in the apartment, to which they replied "no." Officers then asked Latoya if she had a car and if it was present. Latoya responded that she had a burgundy Forenza and that it was parked around the corner. She walked to the location where she said the car was parked, and it was missing. According to Officer Bailey's report, "[s]he did not appear to be upset." Latoya told Officer Bailey that no one else drove her car, but that "she recently lost a set of keys, which contained her vehicle keys." Officer Bailey asked if Latoya had a boyfriend, and she replied that she did but that he was out of town.

Officers then asked for and received permission to search the apartment for the suspect, as well as for the clothing he was wearing. In one of the bedrooms upstairs the officers found a black male lying on a bed, sweating, and breathing heavily. The man, later identified as the Defendant, did not have any identification but told the officers he was Latoya's boyfriend. According to the government, when confronted with this information, Latoya stated, "I have another boyfriend that's out of town."

Once Officer Van Sant, the officer who initiated the traffic stop, arrived at the apartment, he identified the Defendant as the same person he saw run from the Suzuki and through the hole in the fence, even though he was not wearing the same clothing in the bedroom as he was during the foot pursuit. During the search for the Defendant's clothing, officers found a Taurus .357 handgun and a High Point .380 handgun under the mattress where the Defendant had been lying; however, Defendant claims that the guns were found under a mattress in a different bedroom than where the Defendant was lying. The Defendant was then placed under arrest for failure to stop for a blue light, being a felon in possession of a handgun, and possession of a stolen handgun (the Taurus was found to have been reported stolen during a routine NCIC check of the

2

weapons). According to Defendant, the officers were upset that the occupants of the apartment had been less than forthcoming and announced that everyone was going to be arrested and that the child was going to be taken into DSS custody. However, all four officers who testified at the suppression hearing claim that no such statement was ever made concerning arresting the occupants of the apartment or placing the child into DSS custody.

Defendant claims that at this point he was asked if the guns were his and he responded that the firearms belonged to him and that he had placed them in the house. The government claims that as the Defendant was placed into the police vehicle, he volunteered information that both of the guns belonged to him and that he had placed them under the mattress. Also according to the Government, Defendant was then immediately read his *Miranda* warnings and asked if he wished to make a statement. The Defendant stated that he wished to make a statement. Officers then transported the Defendant to the North Charleston Police Department where he again waived his rights under *Miranda* and gave a written statement. In the written statement, he stated that he bought both guns from "some guy," but that he did not know they were stolen and that he did not have them in his possession when he ran from the officers. No officer claimed to have seen the Defendant carrying a weapon during the foot pursuit. The Defendant also claimed in his written statement that officers had threatened to arrest all of the occupants in the apartment and take a child into DSS custody.

## ANALYSIS

Defendant claims that the threats made by the police that everyone in the house would be arrested and that the baby would be placed into D.S.S. custody caused his subsequent *Miranda* waiver to be involuntary. To be admissible, a Defendant's statements to law enforcement must be voluntary under the Fifth Amendment. *See United States v. Braxton,* 112 F.3d 777, 780 (4th

3

Cir. 1987).  The test to determine the voluntariness of a confession "is whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."  *Id.*  Defendant argues that the officers' statements were coercive police activity that rendered any subsequent confession by the Defendant involuntary.  "It is hard to imagine a more significant threat than to arrests one's loved ones, and place a small child in custody.  These threats overborne Mr. Brown's will and critically impaired his capacity for self-determination.  Therefore, Mr. Brown's statements made at the station should also be suppressed."  Def's Mem. at 4.

The Government claims that testimony at the suppression hearing shows that Mr. Brown's first admission that the guns were his and that he had placed them under the mattress was a voluntary statement and was *not* stated in response to any police questioning.  After this voluntary statement, the Government claims that Defendant was immediately read his *Miranda* rights and was asked if he wished to give a statement, which he agreed to do.  The Government also claims that testimony at the suppression hearing shows that no officer, either during the search or the arrest, ever made a specific statement/threat to arrest all of the occupants at the apartment or to take the child to D.S.S.  "While there was certainly conversation amongst law enforcement as to how to proceed with the individuals who had impeded their investigation, nothing was ever said directly to the Defendant or stated in an attempt to purposely coerce the Defendant into confessing to possession of the weapons."  Gov't Mem. at 5.

However, even assuming the police did state that all of the occupants in the house would be arrested and the child taken to DSS, the Court finds that both the pre-*Miranda* and post-*Miranda* statements are still admissible.  The Fourth Circuit has stated that informing a suspect that he faces jail time or a reference to the maximum penalty for the offense does not render a

4

confession involuntary. *Braxton,* 112 F.2d 777, 782 (citing *United States v. Sablotny,* 21 F.3d 747, 752-53 (7th Cir. 1994) (suspect threatened with specter of jail); *United States v. Mendoza-Cecelia,* 963 F.2d 1467, 1475 (11th Cir. 1992) (suspect was advised that he faced ten years in jail)). "We have previously stated that 'a law enforcement officer may properly tell the truth to the accused.'" *Id.* "Indeed, '[t]ruthful statements about [the Defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary.'" *Id.* Therefore, in *Braxton,* the Fourth Circuit held that an officer's statement to a suspect that the maximum statutory penalty for making a false statement on a firearms record was five years was a truthful statement and did not render a subsequent admission involuntary. *Id.*

In this case, even if the officers stated that everyone was going to jail and that the child would be placed into D.S.S. custody, such statements would qualify as truthful statements about the Defendant's predicament and would not be the type of coercion to render Defendant's subsequent statements involuntary. In this case, both of the Rouse women had lied to police when they said they didn't see anyone enter the home recently and stated that no one else was in the home. In addition, Latoya Rouse lied to the police concerning her car and no one else being allowed to drive it as the Defendant testified he had a set of keys to the car and the apartment although he had no driver's license and was precluded from staying in Section 8 housing because of his felony record. Such statements were clearly made to hinder a police investigation, thus both were subject to being placed under arrest. Obviously, had every adult been in the home been arrested, a home where a convicted felon was allowed to keep loaded weapons, the child in the home would have almost certainly been placed into protective custody at that point. Therefore, the officers' statements about everyone going to jail and the baby going to D.S.S. are,

5

under the analysis of *Braxton,* not threats or statements that render the Defendant's subsequent confession involuntary.

Even assuming that the officers' statements could be considered threats, the mere existence of a threat does not render the confession involuntary. "The existence of a threat . . . does not automatically render a confession involuntary. The proper inquiry is whether the confession was 'extracted' *by* the threats." *Braxton,* 112 F.3d at 783. "For a threat . . . to invalidate a Defendant's statement, 'the pressure, in whatever form [or 'however slight'], [must be] sufficient to cause the petitioner's will to be overborne and his capacity for self-determination to be critically impaired.'" *Id.* "Even if the statement influenced [Defendant's] decision to confess, the voluntariness of the confession 'is not . . . to be equated with the absolute absence of intimidation, for under this test virtually no statement would be voluntary.'" *Id.* In deciding whether the Defendant's will was overborne or his capacity for self-determination was critically impaired, the Court must look at the "totality of the circumstances," which will include the Defendant's background, where the statement was given, and how any interrogation was conducted. *United States v. Elie,* 111 F.3d 1135, 1143-44 (4th Cir. 1997).

In this case, considering the totality of the circumstances, the officers' statements that all of the occupants in the apartment could go to jail and that the baby could be placed in D.S.S. custody were not threats that overpowered the Defendant's will or impaired his capacity for self-determination. The officers' statements were made while the Defendant was in Rouse's home. The officers' statement did not contain any language that if Defendant did not confess then everyone would go to jail. Additionally, the Defendant has been arrested approximately a dozen times from May of 2004 through December of 2010. Such a record goes to show that the

Defendant had a clear understanding of what the repercussions of waiving those rights and giving a statement implicating himself would be.

Because the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising that "very few incriminating statements, custodial or otherwise, are held to be involuntary." *Braxton,* 112 F.3d at 786.  This case is no exception.  This is not a case where law enforcement officers "went to extraordinary lengths to extract from the Defendant a confession by psychological means." *Id.*  Brown's incriminating statement was elicited without the aid of any coercive conduct on the part of the officers.  Furthermore, nothing in the record suggests that Brown's "will was overborne."  As a result, the Court finds that Brown's statements were voluntary under the Fifth Amendment.

Therefore, the Court first finds that testimony at the hearing shows that the Defendant's pre-*Miranda* statement was not made in response to any police questioning, and the statement is clearly admissible as *Miranda* only applies to custodial *interrogation.*  Second, the Court finds that the weight of the testimony showed that officers never stated that all of the occupants in the apartment were going to jail and that the baby was going to be placed into D.S.S. custody.  However, even if the Court accepts the Defendant's testimony that officers stated that everyone was going to jail and the baby was going to be placed into D.S.S. custody, Defendant's post-*Miranda* statement is still admissible as the officers' statements, viewed in the totality of the circumstances, do not equate to pressure sufficient to cause the Defendant's will to be overborne and his capacity for self-determination to be critically impaired as stated by the Fourth Circuit in *Braxton.*  The officers' statements are truthful statements about the Defendant's predicament and are not the type of coercion that renders the Defendant's subsequent waiver of his *Miranda* rights and his subsequent confession involuntary.

## CONCLUSION

Based on the foregoing, the court **DENIES** Defendant Jarod A. Brown's motion to suppress.

    **AND IT IS SO ORDERED.**

*[signature]*
PATRICK MICHAEL DUFFY
United States District Judge

**April 14, 2011**
**Charleston, SC**